UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

U.S. COMMODITY FUTURES TRADING
COMMISSION,

       Plaintiff,

  -v-                                      No.  17 CV 4722-LTS-DCF

MICHAEL S. WRIGHT and WRIGHT TIME
CAPITAL GROUP LLC (d/b/a GLOBAL FX
CLUB),

       Defendants.

-------------------------------------------------------x

MEMORANDUM ORDER

       Plaintiff U.S. Commodity Futures Trading Commission ("Plaintiff" or "CFTC"), an independent federal regulatory agency charged by Congress with the administration and enforcement of the Commodities Exchange Act (the "Act"), 7 U.S.C. § 1 et seq., brings this civil action against Defendants Michael S. Wright ("Wright") and Wright Time Capital Group, LLC ("WTCG"), asserting claims for: (1) commodities futures fraud in violation of sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), and retail foreign currency fraud in violation of 17 C.F.R. section 5.2(b); (2) commodities pool operator ("CPO") fraud in violation of section 4o(1) of the Act, 7 U.S.C. § 6o(1); (3) failing to register as a CPO in violation of sections 2(c)(2)(C)(iii)(I)(cc) and 4m(1) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and 17 C.F.R. section 5.3(a)(2); and (4) engaging in prohibited activities in violation of 17 C.F.R. sections 4.20(a)-(c).  After reaching a settlement with Wright, who was WTCG's CEO and chief strategist, the CFTC moved, pursuant to Federal Rule of Civil Procedure 55, for default

judgment against WTCG, which has not appeared or otherwise responded to the claims asserted against it in this action. (Docket entry no. 31.)

The Court has jurisdiction of this action pursuant to section 6c(a) of the Act, 7 U.S.C. § 13a-1, and 28 U.S.C. section 1331.

The Court has considered Plaintiff's submissions carefully and, for the following reasons, Plaintiff's unopposed motion is granted.

BACKGROUND

The following facts are drawn from proffered evidence and Plaintiff's Complaint, the well-pleaded allegations of which are taken as true for the purpose of this motion practice. From approximately August 2010 to June 2017, WTCG purported to operate as a CPO by soliciting funds from investors, pooling the funds together, and using the pooled funds to trade in the foreign exchange ("forex") markets. (Compl., docket entry no. 1 ¶¶ 1, 27.) Co-defendant Wright was the CEO, founder, and chief strategist of WTCG. (Id. ¶ 17.) Neither WTCG nor Wright has ever been registered with the CFTC in any capacity. (Id. ¶¶ 16, 17.)

During the relevant period, Wright and WTCG fraudulently solicited $421,250 from 11 members of the public to participate in a pooled forex investment, using misrepresentations or omissions to induce those persons to invest. (See id. ¶¶ 27-32; Kokal Decl., docket entry nos. 33 ¶ 12, 33-4.) WTCG's fraudulent solicitations, communicated via email, mail, and telephone, included misrepresentations that all or substantially all of the pool participants' funds would be pooled and used to engage in forex trading. (Compl. ¶¶ 27, 28.) For example, WTCG sent a written solicitation to a prospective pool participant that stated that the participant's $30,000 investment would be pooled and used for forex trading and that, after 100% profit had been made, additional gains would be split 85/15 between WTCG and the pool

participant.  (Id. ¶ 29.)  WTCG received pool participants' funds in the name of Wright or WTCG rather than in the name of the pool and did not operate its pool as a separate and distinct legal entity.  (Id. ¶ 59.)

Between August 2010 and April 2016, only about $115,800 of the funds received from investors was transferred to two individual forex trading accounts held in the name of Wright.  (Id. ¶¶ 36-38.)  Trading occurred sporadically between August 2010 and mid-May 2016.  (Id. ¶ 49.)  WTCG engaged in "forex transactions on a leveraged or margined basis that did not result in actual delivery within two days or otherwise create an enforceable obligation to deliver between a seller and buyer that have the ability to deliver and accept delivery, respectively, in connection with their line of business."  (Id. ¶ 40.)  As of mid-May 2016, the trading accounts had realized net trading losses of approximately $114,300 and had ceased all trading activities.  (Id. ¶¶ 41, 50.)  The majority of the pool participants' funds were deposited into bank accounts held in the name of Wright and WTCG, and had been misappropriated for "unauthorized personal or business expenses such as food, clothing, jewelry, and entertainment." (Id. ¶¶ 33, 42-45.)  Wright was the sole authorized signatory of the bank accounts and the forex trading accounts.  (Id. ¶¶ 33-34, 36-37.)  Wright and WTCG concealed the fraudulent scheme by issuing false account statements to pool participants via email.  (Id. ¶¶ 46-53.)  These statements purported to reflect profitable earnings in the pool despite significant losses in forex trading and the diversion of funds for personal and unauthorized business use.  (Id. ¶ 48.)  By December 2016, WTCG had ceased communicating with pool participants.  (Id. ¶ 57.)  Only $50,000 of pool participant funds were returned to two victims.  (Kokal Decl. ¶ 12.)

This case was commenced on June 22, 2017.  Wright pled guilty in a parallel criminal case on October 13, 2017 (USA v. Wright, No. 17 CR 00459 PAE (S.D.N.Y.) (the

"Criminal Action"), docket entry no. 12) and reached a settlement with the CFTC in this action on August 2, 2018. (Docket entry no. 35.) Pursuant to the judgment entered in the criminal case and consent judgment in the civil case, Wright must pay restitution to pool participants of $358,070 and $400,000, respectively, but any sums paid in satisfaction of one judgment will be credited against Wright's obligations under the other. (Docket entry no. 35; Criminal Action, docket entry no. 18.) The Clerk of Court issued a Certificate of Default in respect of WTCG on April 4, 2018. (Docket entry no. 28.) Plaintiff filed its motion for default judgment against WTCG on July 27, 2018. (Docket entry no. 31.)

## DISCUSSION

In determining whether to grant a motion for default judgment, courts within this district consider three factors: "(1) whether the defendant's default was willful; (2) whether defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment." Indymac Bank, F.S.B. v. National Settlement Agency, Inc., 2007 WL 4468652, at *1 (S.D.N.Y. Dec. 20, 2007) (internal citation omitted). The Court finds that all three of the foregoing factors weigh in Plaintiff's favor. First, WTCG's failure to appear and respond to Plaintiff's Complaint and the instant motion is indicative of willful conduct. See Indymac Bank, F.S.B., 2007 WL 4468652, at *1 (holding that non-appearance and failure to respond to a complaint or motion for default judgment indicate willful conduct). Second, because WTCG has failed to appear and Wright, its CEO, has pleaded guilty and settled the claims asserted against him individually in this civil action, the Court is unaware of any meritorious defense that WTCG could present. Finally, the Court finds that, in light of the considerable amount of time that has elapsed since Plaintiff filed the Complaint, Plaintiff will be prejudiced if it is denied the ability to seek

judgment by default. Thus, the Court concludes that it is appropriate to proceed upon Plaintiff's motion for judgment by default.

Plaintiff's Claims

Having found that these factors favor Plaintiff, the Court must next determine whether Plaintiff has pleaded facts supported by evidence sufficient to establish WTCG's liability under the Act. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981) (reviewing sufficiency of complaint and inquest record after finding of default). "[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability" except those relating to damages. Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992).

Plaintiff has demonstrated that it is entitled to relief on its first cause of action, which alleges that WTCG engaged in commodity futures fraud pursuant to sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), and engaged in retail forex fraud in violation of 17 C.F.R. section 5.2(b). "To prove a violation of §§ 4b(a)(2)(A)-(C) of the [Act], the CFTC must prove that defendants (1) made misrepresentations or factual omissions; (2) that were material to the investor's decision to invest; and (3) that defendants acted with scienter." U.S. Commodity Futures Trading Comm'n v. Highland Stone Capital Mgmt., L.L.C., No. 11 CV 5209 KBF, 2013 WL 4647191, at *15 (S.D.N.Y. Aug. 29, 2013). The Complaint alleges that WTCG solicited $421,250 from 11 investors to participate in a pooled forex investment by making misrepresentations concerning how the money would be invested. The eleven investors, and their financial losses, are identified in a schedule appended to a declaration filed by Plaintiff in support of the motion. (Kokal Decl. Ex. D.) WTCG's misrepresentations and omissions in the solicitations and account statements were material because they concerned profit and risk. See

U.S. Commodity Futures Trading Comm'n v. Int'l Fin. Servs., Inc., 323 F. Supp. 2d 482, 501 (S.D.N.Y. 2004) ("[M]isrepresentations concerning profit and risk . . . are . . . material as a matter of law.").

To establish the scienter element, Plaintiff must demonstrate that WTCG knew or recklessly disregarded the fact that it was making materially false statements. Highland Stone Capital Mgmt., L.L.C., No. 11 CV 5209 KBF, 2013 WL 4647191, at *15 ("[S]cienter may be satisfied by showing defendants had actual knowledge that the material statements they made were false, or that they were reckless in failing to discover their falsity."). The Complaint alleges that both Wright and WTCG made such statements. Because Wright was the CEO and sole authorized signatory of WTCG's bank and forex trading accounts and engaged in account transactions in furtherance of his duties as WTCG's agent, WTCG knew or should have known that pool funds were being misappropriated and were not used for forex trading.[1] WTCG also knew or should have known that the account statements provided to pool participants that purported to show consistently profitable earnings were false because WTCG did not engage in any forex trading during several of the periods shown on the statements. (Compl. ¶ 48.) Plaintiff's uncontroverted allegations thus suffice to establish that WTCG acted with scienter.

Plaintiff has also established that WTCG engaged in retail forex fraud in violation of 17 C.F.R. section 5.2(b), which provides that:

> It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction:
> (1) To cheat or defraud or attempt to cheat or defraud any person;
> (2) Willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or

---

[1] WTCG is liable for the acts of its agent Wright pursuant to section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and 17 C.F.R. section 1.2, because Wright engaged in these acts within the course and scope of his office and agency for WTCG.

> (3) Willfully to deceive or attempt to deceive any person by any means whatsoever.

17 C.F.R. § 5.2(b). Here, the fraudulent conduct described above in connection with Plaintiff's claim under section 4(b)(a)(2)(A)-(C) of the Act, if communicated through mail, email, or telephone, constitutes a violation of 17 C.F.R. section 5.2(b). See U.S. Commodity Futures Trading Comm'n v. iGlobal Strategic Mgmt., LLC, No. 12 CV 6574 BSJ, 2012 WL 6930308, at *4 (S.D.N.Y. Nov. 19, 2012). As Plaintiff has alleged that WTCG sent fraudulent solicitations and account statements through mail, email, and telephone, the CFTC has established its retail fraud claim. (See Compl. ¶¶ 27-32, 46-57.)

The Court next turns to the CFTC's second cause of action, asserting a claim for CPO Fraud pursuant to section 4o(1) of the Act, which provides that:

> (1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C.S. § 6o(1) (LexisNexis 2010). The same elements of fraud applicable to violations of section 4(b)(a)(2)(A)-(C) of the Act and 17 C.F.R. section 5.2(b) must be established for this claim, plus an additional element—that the violator acted as a CPO. See U.S. Commodity Futures Trading Comm'n v. iGlobal Strategic Mgmt., LLC, No. 12 CV 6574 BSJ, 2012 WL 6930308, at *5 (S.D.N.Y. Nov. 19, 2012). Section 1a(11) of the Act defines a CPO, in relevant part, as any person "engaged in a business that is of the nature of a commodity pool . . . who, in connection therewith, solicits, accepts, or receives from others, funds . . . for the purpose of trading in commodity interests." 7 U.S.C.S. § 1a(11) (LexisNexis 2010). Because the object of

WTGC's previously discussed fraudulent conduct was to solicit and accept funds from others for the purpose of trading in commodity interests, the CFTC is entitled to relief in connection with its second cause of action. (See Compl. ¶¶ 27-32.)

The Court next considers the CFTC's third cause of action, in which it alleges that WTCG failed to register as a CPO pursuant to sections 2(c)(2)(C)(iii)(I)(cc) and 4m(1) of the Act and 17 C.F.R. section 5.3(a)(2). The CFTC alleges that WTCG never registered with the Commission and does not qualify for any of the statutory exceptions to registration. These allegations are sufficient, in the context of the record before the Court, to establish WTCG's liability under the relevant statutes and regulations. Section 2(c)(2)(C)(iii)(I)(cc) of the Act provides that any non-eligible contract participant ("ECP") entity must be registered in order to operate or solicit funds for any pooled investment in connection with the forex transactions.[2] 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc). An ECP is defined by 7 U.S.C. section 1a(18)(A)(iv) as, inter alia, a commodity pool that has total assets exceeding $5,000,000, and is formed and operated by a person subject to regulation under this chapter. 7 U.S.C. § 1a(18)(A)(iv). Plaintiff alleges that WTCG's pooled investment vehicle never had assets exceeding $5,000,000, and was thus not eligible for the ECP exception to registration under section 2(c)(2)(C)(iii)(I)(cc) of the Act. (Kokal Decl. ¶ 12.) Section 4m(1) of the Act and 17 C.F.R. section 5.3(a)(2) require the registration of a CPO that uses any means or instrumentality of interstate commerce and engages in forex transactions, respectively. Because WTCG engaged in forex transactions and

---

[2] This registration requirement applies to entities engaged in forex transactions "offered, or entered into, on a leveraged or margined basis" that did not "result[] in actual delivery within 2 days; or create[] an enforceable obligation to deliver between a seller and buyer that have the ability to deliver and accept delivery, respectively, in connection with their line of business." 7 U.S.C.S § 2(c)(2)(C)(i) (LexisNexis 2010). The CFTC alleges that WTCG was such an entity at the relevant times. (Compl. ¶ 40.)

perpetrated its fraud by mail, email, and telephone, its failure to register also constitutes violations of section 4m(1) of the Act and 17 C.F.R. section 5.3(a)(2).

Plaintiff has established its entitlement to relief upon its fourth cause of action, which asserts that WTCG failed to operate its pool pursuant to 17 C.F.R. sections 4.20(a)-(c), which (1) requires a CPO to "operate its pool as an entity cognizable as a legal entity separate from that of the pool operator," 17 C.F.R. § 4.20(a)(1), (2) provides that pool funds "received by a [CPO] from an existing or prospective pool participant for the purchase of an interest . . . in a pool that it operates . . . must be received in the pool's name," 17 C.F.R. § 4.20(b), and (3) prohibits a CPO from "[commingling] the property of any pool that it operates . . . with the property of any other person." 17 C.F.R. § 4.20(c). Plaintiff alleges that WTCG failed to operate its commodities pool as a legal entity separate from WTCG, received pool participants' funds in its own name rather than the pool's, and commingled pool funds with the assets of WTCG and Wright by depositing pool participant funds into bank accounts held in the name of or for the benefit of Wright or WTCG. (Compl. ¶¶ 33-34, 36-37, 59.)

Relief Sought

Pursuant to sections 6c(a)-(b) of the Act, 7 U.S.C. §§ 13a-1(a)-(b), Plaintiff seeks a judgment permanently enjoining WTCG from committing further violations of the Act and from participating in commodities markets. A permanent injunction "is appropriate where there is a likelihood that unless enjoined the violations will continue." U.S. Commodity Futures Trading Comm'n v. American Bd. of Trade, Inc., 803 F.2d 1242, 1250–51 (2d Cir.1986). Issues that a court must consider in determining whether to grant permanent injunctive relief include the "egregiousness of the defendant's actions; the isolated, recurrent, or systematic nature of the violations; the degree of scienter involved; the Defendants' recognition of the wrongfulness of

the conduct; and the likelihood that the Defendants' customary business activities will present opportunities for future violations." Commodity Futures Trading Comm'n v. McDonnell, No. 18 CV 361, 2018 WL 4090784, at *52 (E.D.N.Y. Aug. 28, 2018). Here, Plaintiff's uncontroverted allegations and evidentiary proffers show that WTCG knowingly engaged in a systematic scheme to perpetrate fraud over a period of years, that WTCG's entire business model relied on fraudulently deceiving investors, and that Wright used much of the investors' funds for personal or unauthorized business expenditures. There is no indication that WTCG would not pursue such activities in the future in the absence of an injunction. On the basis of WTCG's past conduct, which it has not sought to defend, the Court finds there is a reasonable likelihood of continued violations and that a permanent injunction, as detailed in the Order for Final Judgment by Default, Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief Against Defendant Wright Time Capital Group LLP (D/B/A Global FX Club) (the "Order for Final Judgment"), entered concurrently with this Memorandum Order, is warranted.

Section 6c(d)(3)(A) of the Act, 7 U.S.C. § 13a-1(d)(3)(A), authorizes restitution in the amount of the ill-gotten gains of the defendant. CFTC has proffered uncontroverted evidence that, through its fraud, WTCG received a total of $421,250 from identified pool participants, returned a total of $50,000 to two pool participants, and retained the difference of $371,250. (Kokal Decl. ¶ 12.) Accordingly, the Court imposes a restitution obligation of $371,250 on WTCG, against which dollar-for-dollar credit shall be given for any restitution payment made by Wright in either his civil or criminal case for losses incurred by the pool participants.

Plaintiff also seeks the imposition of a civil monetary penalty ("CMP") on WTCG. "The [Act] and the regulations thereunder also authorize courts to impose a CMP for

each statutory or regulatory violation of up to the greater of $140,000 or triple the offender's monetary gain." U.S. Commodity Futures Trading Comm'n v. 4X Sols., Inc., No. 13 CV 2287 RMB FM, 2015 WL 9943241, at *3 (S.D.N.Y. Dec. 28, 2015), report and recommendation adopted, No. 13 CV 2287 RMB FM, 2016 WL 397672 (S.D.N.Y. Jan. 29, 2016) (citing 7 U.S.C. § 13a–1(d)(1)(A); 17 C.F.R. § 143.8(a)(1)(ii)(D)). "The [Act] affords district courts broad discretion in fashioning appropriate remedies for such violations, including the imposition of civil monetary penalties." Commodity Futures Trading Comm'n v. Paragon FX Enterprises, LLC, No. 11 CV 7740 FM, 2015 WL 2250390, at *5 (S.D.N.Y. Feb. 2, 2015). In determining the appropriate amount, the Court focuses on the gravity of the misconduct. Id. Courts in this circuit have imposed the treble amount in cases involving egregious and intentional fraudulent conduct. See e.g., 4X Sols., Inc., 2015 WL 9943241, at *4 (finding treble damages appropriate in a Ponzi scheme case with numerous victims of fraud). Here, WTCG and its agent Wright intentionally implemented over a period of years an extensive artifice to obtain clients' money and divert those funds to personal and other unauthorized purposes instead of investing these funds. The scheme included misrepresentations at the time of solicitation, the fabrication and issuance of fraudulent account statements showing fictional investment activities and returns, and diversionary tactics when clients sought to withdraw their investments. This gravely serious conduct warrants treble damages. The Court therefore imposes a CMP of $1,113,750 upon WTCG.

The Court also grants Plaintiff's request for post-judgment interest at the statutory rate set forth in 28 U.S.C. section 1961.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a default judgment is granted. As detailed in the Order for Final Judgment entered concurrently with this Memorandum Order, the Court grants Plaintiff's request for injunctive relief, imposes a restitution obligation in the total amount of $371,250, with dollar-for-dollar credit to be given for any amounts collected and disbursed in connection with this case or the companion criminal case against Wright, and a CMP of $1,113,750, representing the trebled amount of ill-gotten profits. Interest will accrue on the judgment at the rate set forth in 28 U.S.C. section 1961. The Clerk of Court is respectfully directed to enter judgment accordingly and to close this case. This Memorandum Order resolves docket entry no. 31.

SO ORDERED.

Dated: New York, New York
      December 7, 2018

    /s/ Laura Taylor Swain
    LAURA TAYLOR SWAIN
    United States District Judge